# EXHIBIT 12

# EXCERPTS FROM DEPOSITION OF PLAINTIFF ERNESTO JIMENEZ-GONZALEZ

# Transcript of the Testimony of
# Ernesto Jimenez-Gonzales

## Date: April 30, 2025

### Ernesto Jimenez-Gonzales, et al v. Cora Texas Growers, et al

All electronic deposition & exhibit files
are available at **www.psrdocs.com**
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**

## Professional Shorthand Reporters, Inc.

Phone: 504-529-5255
Fax: 504-529-5257
Email: reporters@psrdocs.com
Internet: http://www.psrdocs.com

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

ERNESTO JIMENEZ-GONZALES          CIVIL ACTION
AND JOSE ALBERTO                  3:24-CV-00820
TORRES-MARTINEZ,
ON BEHALF OF THEMSELVES AND
OTHERS SIMILARLY SITUATED

VERSUS

CORA TEXAS GROWERS                JUDGE DICK
AND HARVESTERS AGRICULTURAL
ASSOCIATION, INC. AND CORA
TEXAS MANUFACTURING
COMPANY, LLC

              DEPOSITION OF
ERNESTO JIMENEZ-GONZALES, AVENIDA
FERROCARRIL 749, COLONIA SAN JOAQUIN, TORREON,
COAHUILA, MEXICO CP 27340, TAKEN VIA ZOOM FROM
TORREON, MEXICO, ON THE 30TH DAY OF APRIL, 2025.


APPEARANCES:

    DAWSON MORTON, LLC
    (BY:  DAWSON MORTON, ESQUIRE)
    104 CAMBRIDGE AVENUE
    DECATUR, GEORGIA 30030

            - AND -

    JAMES KNOEPP, ESQUIRE
    150 E. PONCE DE LEON AVENUE
    SUITE 340
    DECATUR, GEORGIA 30030

       ATTORNEYS FOR PLAINTIFFS

Page 21

1  October of 2023?
2      A.   Yes.
3      Q.   How many months did you have that
4  Telcel phone prior to October of 2023?
5      A.   Also around 6 months.
6      Q.   Did you have a Telcel phone before
7  April of 2023?
8      A.   Yes.  I have always had the Telcel
9  company; it's just -- I just haven't been
10 consistent.
11     Q.   When you had the Telcel phone in April
12 of 2023, did you also have that one for
13 6 months?
14     A.   Yes.
15     Q.   Did you have a Telcel phone before
16 October of 2022?
17     A.   Yes.
18     Q.   Did you have a Telcel phone between
19 April of 2022 and October of 2022?
20     A.   When we go work in Louisiana, we hire
21 a phone company called Cricket.  During our stay
22 in Louisiana, we use Cricket, and in Mexico, I
23 use Telcel.
24     Q.   What was your Cricket telephone
25 number?

Page 44

1      A.   Well, costs related to gas, and also,
2   the money that you pay at the booth or at the
3   toll -- interpreter correction -- and for meals.
4      Q.   Other than the $950 you paid to
5   Bernice, the gas money, the tollbooths and your
6   meals, did you pay any other out-of-pocket
7   expenses for your trip from your home in Torreón
8   to the U.S. Consulate in Monterrey in 2020?
9      A.   Yes, to the lady that recruits us and
10  gives us the information.
11     Q.   How much did you pay the recruiter to
12  obtain the H-2A visas you applied for from the
13  U.S. consulate in Monterrey?
14     A.   1,000 pesos.
15     Q.   Did you pay the 1,000 pesos to the
16  recruiter in the year 2020?
17     A.   Yes.
18     Q.   Did you pay 1,000 pesos to the
19  recruiter in the year 2021?
20     A.   Yes.
21     Q.   Did you pay 1,000 pesos to the
22  recruiter in 2022?
23     A.   Yes.
24     Q.   Did you pay 1,000 pesos to the
25  recruiter in 2023?

Page 45

1      A.   Yes.
2      Q.   I want you to turn to the back side of
3  your Mexican passport book.
4      A.   Okay.
5      Q.   You are looking at the back side of
6  your passport book.  I see a sticker there, and
7  there is a name, Bernice, on the back.  Do you
8  see that?
9      A.   Yes.
10     Q.   Is that the Bernice you have been
11 speaking of this morning?
12     A.   Yes.
13     Q.   What is the name of the recruiter that
14 you paid 1,000 pesos to every year between 2020
15 and 2023?
16     A.   Senora Flor.
17     Q.   Do you have any contact information
18 about Senora Flor like you do Bernice?
19     A.   The phone number.
20     Q.   What is Senora Flor's phone number?
21     A.   I don't have it at this time.
22     Q.   Now, the $1,000 you paid to
23 Senora Flor, did you pay that in cash as well?
24     A.   It was 1,000 Mexican pesos.
25     Q.   1,000 Mexican pesos that you paid in

Page 85

1         MR. MORTON:

2            Objection.

3         THE WITNESS:

4            We had just worked trailer work.

5  EXAMINATION BY MR. DAVIS:

6     Q.   Now, you believe you are an

7  appropriate representative of all of the people

8  who would bring a lawsuit against the Cora

9  Association?

10     A.   Yes.

11     Q.   You have sufficient knowledge to talk

12  about their claims and how their claims are

13  similar to your claims?

14     A.   Yes.

15     Q.   You have produced documents in support

16  of your claims as well as the claims of the

17  people who you intend to represent, correct?

18     A.   Correct.

19     Q.   When you produced those documents, it

20  was because you understood their value to your

21  case, as well as your ability to describe them?

22     A.   Yes.

23     Q.   I would like to show you a copy of a

24  document you produced in the lawsuit.  I am

25  showing you what I have marked as Plaintiffs'

Page 87

1    Q.   When you produced this document in
2  your lawsuit, do you believe this adds to the
3  allegations you are making about the Cora
4  Association?
5         MR. MORTON:
6              Objection.
7         THE WITNESS:
8              Well, breach of contact in terms
9      of what we were going be paid.
10 EXAMINATION BY MR. DAVIS:
11   Q.   Does your breach of contract claim
12 concern any other issue than what you believe is
13 the price you should have been paid?
14   A.   For overtime and charges when I was
15 transporting myself around and food expenses.
16   Q.   I would like for you to turn to
17 page 176 of the document you produced.
18         MR. MORTON:
19              Objection.
20              Plaintiffs' counsel produced
21      documents that were in plaintiff's
22      possession, but this individual plaintiff
23      did not produce this document.
24 EXAMINATION BY MR. DAVIS:
25   Q.   Mr. Jimenez, the language I am showing

Page 88

1  you, does this describe the type of work that
2  you were doing for the Cora Association?
3      A.   Let me read it.
4      Q.   Sure.  And I want to remind you,
5  Mr. Jimenez, that the papers are in your hand,
6  at page 176.
7           Does this describe the work you did
8  for the Cora Association?
9      A.   It is just that it doesn't correspond
10 to the work that we were performing.
11     Q.   Tell me, how does it fail to
12 correspond to the work you were to perform?
13     A.   The thing is, we drove trailer trucks,
14 and we used to transport the product from the
15 field to the mill, and that's not included here.
16     Q.   Look at the first page of the
17 documents you are holding in your hand.
18          When you worked for the Cora
19 Association, did you generally work between
20 August of any year and December of any year?
21     A.   Sometimes until January.
22     Q.   Did you normally work with at least
23 200 other people who also operated the trailers?
24     A.   Yes.
25     Q.   Was the work normally 6 days per week

Page 89

1  or more?
2     A.   Seven days a week.
3     Q.   So during the harvesting season, you
4  would also drive on Sundays?
5     A.   Yes.
6     Q.   Is it accurate that you always worked
7  more than 40 hours in any workweek?
8     A.   Yes.
9     Q.   What was your understanding of any
10 deduction that the Cora Association would take
11 from your pay?
12    A.   Well, they are paying us about half of
13 what they should have been paying us, and then
14 we realized they were not paying us overtime.
15 That is what we realized.
16         Well, in 2023, when we arrived, they
17 told us that our hourly rate had been almost
18 doubled, to 24, and prior to that, the increases
19 per year had only been of 40 cents or 50 cents,
20 so we were surprised when we saw that it was
21 almost double.  And we realized that was the
22 rate per hour that we should have been getting
23 every year.  Maybe not every year exactly,
24 because each year, it varies.
25    Q.   It wasn't until the fall of 2023 that

Page 90

1  you formed the belief that your wages should be
2  somewhere around $23 per hour?
3      A.   Approximately.
4      Q.   Before 2023, did you see any job
5  contract that identified a price of $23 per
6  hour, approximately?
7      A.   No.
8      Q.   Why do you believe the prior rates
9  should have been paid at $23 if those contracts
10 did not stay that same rate?
11     A.   Because they took us there under the
12 lie that they were going to take us to the
13 fields, but at the last minute, they told us
14 that we would be driving trailers.
15     Q.   Ma'am, will you repeat that answer?
16          THE INTERPRETER:
17               Because they took us there under
18      the lie that they were going to take us to
19      the fields, but at the last minute, they
20      told us that we would be driving trailers.
21 EXAMINATION BY MR. DAVIS:
22     Q.   Did you have a commercial driver's
23 license in 2020, before you entered the United
24 States?
25     A.   Yes.

Page 99

1   Q.  So your dispute is against the rate of
2   pay you received for those hours; is that
3   correct?
4        MR. MORTON:
5             Objection.
6        THE WITNESS:
7             Well, it is actually the
8        overtime, and also, the rate of pay, which
9        was being paid at half, and also, all of
10       the round-trips.
11  EXAMINATION BY MR. DAVIS:
12   Q.  With respect to overtime, do you
13  believe your time sheets are the right evidence
14  to show the amount of overtime hours that you
15  may have worked while employed with Cora
16  Association?
17   A.  Yes.  I have my pay stubs.
18   Q.  Do those pay stubs show the number of
19  hours you worked accurately?
20   A.  Yes.
21   Q.  So as it relates to hours that you
22  recorded, you believe that the hours that you
23  recorded are reliable to know the amount of time
24  that you actually spent working for the Cora
25  Association?

Page 100

```
 1        A.    Yes.
 2        Q.    Earlier, I asked you about your
 3   claims, and also, I asked you if what you are
 4   claiming is also true for the people that you
 5   intend to represent in the case.  I would like
 6   to ask you now, do you believe that the hours
 7   that the other people who you are representing
 8   recorded are truthful and reliable?
 9        A.    Yes.
10        Q.    Did you give Cora a copy of your CDL
11   license before you entered the United States in
12   September of 2020?
13        A.    Yes, every year.
14        Q.    Why would you give Cora a copy of your
15   CDL license every year?
16        A.    Well, because it was a requirement to
17   be able to work on a trailer.
18        Q.    Before you entered the United States,
19   in September of 2020, you knew that a CDL
20   license was a requirement for a job with the
21   Cora Association?
22        A.    Yes.
23        Q.    Now, again, I want to ask you, as it
24   relates to your role in representing other
25   people in this case, do you agree that the other
```

Page 101

1  people that you intend to represent also knew
2  that the CDL license was a requirement of the
3  job?
4      A.   Yes.
5      Q.   Everyone who worked for the Cora
6  Association and who you intend to represent now
7  had CDL licenses; is that correct?
8      A.   Correct.
9      Q.   So who was it who told you that this
10 job was going to be a field job?
11     A.   Can you repeat that question?
12     Q.   Sure.
13     MR. DAVIS:
14         Cathy?
15     (Requested read back as follows:
16     "Q. So who was it who told you
17     that this job was going to be a field
18     job?")
19     THE WITNESS:
20         Ms. Flor.
21 EXAMINATION BY MR. DAVIS:
22     Q.   Did you have any other employers that
23 you identified to the U.S. Consulate at
24 Monterrey in 2020, 2021, 2022 or 2023?
25     MR. MORTON: